1  John D. Tennert, III, NV Bar No. 11728
   Therese M. Shanks, NV Bar No. 12890
2  MaryJo E. Smart, NV Bar No. 16139
   **FENNEMORE CRAIG, P.C.**
3  7800 Rancharrah Parkway
   Reno, Nevada 89511
4  Telephone: (775) 788-2200
   Facsimile: (775) 788-2279
5  jtennert@fennemorelaw.com
   tshanks@fennemorelaw.com
6  msmart@fennemorelaw.com

7  Farhad Novian (*admitted pro hac vice*)
   Andrew B. Goodman (*admitted pro hac vice*)
8  Alexander P. Davis (*admitted pro hac vice*)
   **NOVIAN & NOVIAN LLP**
9  1801 Century Park East, Suite 1201
   Los Angeles, California 90067
10 farhard@novioanlaw.com
   agoodman@novianlaw.com
11 davis@novianlaw.com

12 Chad Hummel (*admitted pro hac vice*)
   **SIDLEY AUSTIN LLP**
13 1999 Avenue of the Stars, 17th Floor
   Los Angeles, California 90067
14 chummel@sidley.com

15 Anna Tutundjian (*pro hac vice pending*)
   atutundjian@sidley.com
16 **SIDLEY AUSTIN LLP**
   555 West Fifth Street
17 Los Angeles, CA 90013
   atutundjian@sidley.com

18

19 *Attorneys for Plaintiff EBET, Inc.*

20                    **UNITED STATES DISTRICT COURT**

21                          **DISTRICT OF NEVADA**

22 EBET, Inc.,                              CASE NO: 2:23-CV-01830-GMN-DJA

23                    Plaintiff,
            v.                              **FIRST AMENDED COMPLAINT**

24 Aspire Global International Limited, a Malta
   Corporation; AG Communications Limited, a
25 Malta Corporation; Aspire Global 7 Limited,
   a Malta Corporation; Aspire Global PLC, a
26 Malta Corporation; Neogames S.A.,, a
   Luxembourg Corporation; NeoGames
27 Connect S.a.r.l., a Luxembourg corporation,
   NeoGames Connect Limited, a Malta
28 Corporation; and DOES I through X,
   inclusive; ROE CORPORATIONS I through

1   X, inclusive,

2

3                        Defendants.

4          Plaintiff EBET, INC. ("EBET"), by and through its counsel of record, complains and alleges

5   as follows:

6                                    **INTRODUCTION**

7          1.      This lawsuit arises from the fraud perpetrated on EBET by defendants ASPIRE

8   GLOBAL INTERNATIONAL LIMITED ("Aspire Ltd."), AG COMMUNICATIONS LIMITED

9   ("AG Communications"), ASPIRE GLOBAL 7 LIMITED ("AG 7"), and ASPIRE GLOBAL

10  PLC ("Aspire PLC") (collectively "Aspire Defendants").   The Aspire Defendants are a group of

11  companies that own, operate and provide online gambling and casino software.   Relevant to this

12  litigation, the Aspire Defendants manage and provide iGaming offerings, which involve players

13  placing bets, engaging in lottery and/or playing casino-type games for cash on the internet.

14  Aspire PLC wholly owns Aspire Ltd., AG Communications, and AG 7.

15         2.      The Aspire Defendants perpetrated this fraud on EBET as part of a conspiracy with

16  Aspire PLC's parent corporations, defendants NEOGAMES S.A. ("Neogames S.A."),

17  NEOGAMES CONNECT S.A.R.L. and NEOGAMES CONNECT LIMITED (together,

18  "Neogames Connect") (collectively, "Neogames" or "Neogames Defendants") (the Aspire

19  Defendants and Neogames are collectively, "Defendants").   The fraud started when the Aspire

20  Defendants represented and warranted the nature, scope, integrity, and financial performance of

21  certain consumer-facing website assets and related player database, related internet domains, and

22  intellectual property for the online casino brands called Karamba, Hopa, Generation VIP, Griffon

23  Casino, Scratch2Cash, Dansk 777 and Bettarget (collectively, the "B2C Assets").   B2C is

24  common industry term referring to "business to consumer" and in this instance, business-to-

25  consumer based assets.   The fraud continued when the Aspire Defendants sold the B2C Assets to

26  Plaintiff on November 29, 2021 and continued to conspire with Neogames thereafter and through

27  the date of this filing.

28         3.      Neogames S.A. is a former subsidiary of Aspire PLC.   Despite spinning off to

become an independent company in 2014, Neogames S.A. retained common ownership and management with Aspire PLC. Neogames S.A. then acquired Aspire PLC in 2022, through its subsidiaries Neogames Connect, merging Neogames' and the Aspire Defendants' unity of interests once again.

4. The motive for the conspiracy between Neogames and the Aspire Defendants included not only the Aspire Defendants' short term goal of taking 65 million Euro from Plaintiff as a purchase price for the B2C Assets on or about November 29, 2021 but also included the ultimate vision and the defendants' ultimate goal of being acquired itself at a much larger price by a third-party suitor. At the time of the November 29, 2021 sale of B2C Assets to Plaintiff, the Aspire Defendants owned and operated the subject B2C Assets as well as "B2B" (business-to-business) assets.

5. Neogames and the Aspire Defendants knew at all times that the B2C Assets were compromised from both an operational and an acquisition perspective because the Aspire Defendants had artificially lowered their operating costs which resulted in an artificially and misleadingly higher EBITDA. Neogames knew this because Neogames formerly owned and operated the Aspire Defendants' B2C Assets. Plaintiff was unaware and had no ability to become aware of these issues at the time it purchased the B2C Assets.

6. Neogames and the Aspire Defendants also knew that in order to obtain the maximum purchase price from a third-party purchaser at some point, Aspire PLC needed to make itself appear highly profitable. And if Aspire PLC was going to be marketed as more profitable than it actually was, Aspire PLC needed to remove the compromised B2C Assets from its asset base.

7. Enter EBET, a company that at the time of being introduced to the Aspire Defendants in June 2021 had just come off the closing of an IPO on the Nasdaq market and was in search of acquisitions and specifically EBITDA-producing types of assets which would be instantly accretive to its growth as an early stage company and which would include signficiant player databases on which to cross-market EBET's esports offerings. The Aspire Defendants marketed their B2C Assets to EBET in the hope that EBET would acquire these assets at an

1  optimized price and inflated valuation given the artificially lower costs and size of the purported

2  player database.

3      8.    But the Aspire Defendants did not merely market their B2C Assets to EBET;

4  instead, they misrepresented and concealed the true nature of the assets being transferred and

5  fraudulently altered their financials, and then, at the acquisition closing convinced EBET to

6  concurrently sign two (2) service agreements with the Aspire Defendants. The service

7  agreements provided that EBET would utilize the Aspire Defendants licenses to operate the B2C

8  Assets for a term of three (3) years. The service agreements also required EBET to use the

9  Aspire Defendants' core player software platform and CRM software platform which effectively

10  prevented EBET from discovering or addressing the manner in which Aspire Defendants

11  managed front-end engagement with players or the interaction and payments due to marketing

12  partners.

13      9.    All of this was done to make the B2C Assets appear profitable when in fact, they

14  were underperforming, compromised and not nearly as profitable as the Aspire Defendants

15  represented these assets to be.

16      10.   Once the Aspire Defendants successfully duped EBET into acquiring the B2C

17  Assets, Neogames announced its acquisition of Aspire PLC, a subsidiary that had just been

18  infused with EBET's cash from the purchase of the B2C Assets. Neogames (and, by extension,

19  the Aspire Defendants) then sought and obtained a Nevada gaming license. Upon information

20  and belief, Neogames did not disclose the Aspire Defendants' and its officers' fraudulent

21  conduct described herein to the Nevada Gaming Commission or Nevada Gaming Control Board.

22  Based on public reporting, Neogames subsequently entered into negotiations with a third party

23  for its acquisition of Neogames.

24      11.   Following the closing of its transaction, however, EBET discovered the Aspire

25  Defendants' fraud. This fraud includes, and is likely not limited to:

26      a.    Falsely reduced operating costs, which were done by defrauding third party

27          affiliate marketing vendors out of amounts rightfully owed to those vendors for

28          years;

b. False databases of player accounts, which did not contain actual player accounts, but accounts created with Neogames' email addresses that appear to be fake and/or inactive, but which the Aspire Defendants represented were active and for which EBET paid as if they were active;

c. False financials, showing profits that did not exist;

d. False promises on the financial performance capabilities of the B2C Assets, as well as on the safety and compliance of the Aspire Defendants' platforms; and

e. False and/or negligent misrepresentations as to the Aspire Defendants' status of their gaming license compliance in key jurisdictions, and including, specifically, Germany.

12. EBET then discovered that the fraud is not unique to EBET, or the B2C Assets. The Aspire Defendants have recently been sued by various third parties also alleging fraud, including, manipulation/falsification of financial records and payments, and other wrongful conduct.

13. EBET now brings this lawsuit to rectify the fraud perpetrated upon it in furtherance of Neogames' and the Aspire Defendants' unlawful scheme.

## JURISDICTION AND VENUE

### I. This Court has Subject Matter Jurisdiction.

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3), because it involves a suit between citizens of different states, with foreign citizens as additional parties, there is complete diversity between Plaintiff, on one part, and Defendants on the other, and the amount in controversy exceeds $75,000.

### II. This Court has Venue.

15. Venue is proper in Nevada because EBET is a Nevada entity, and the Aspire Defendants have a United States office located in Las Vegas, Nevada and conduct business in Nevada. As will be explained below, Defendants have consented to venue in Nevada, and the conduct complained of occurred in, was aimed toward, and is felt in Nevada.

### III. This Court has Personal Jurisdiction.

**A.** ***Defendants' Wrongful Conduct Was Directed at a Nevada Citizen.***

16.     EBET is a company incorporated under the laws of the State of Nevada, formerly known as Esports Technologies, Inc.

17.     At all relevant times, EBET's principal place of business is and was located in Las Vegas, Nevada.

**B.** ***Defendants are Alter Egos and/or Agents of Each Other***

18.     Aspire Ltd., AG Communications, AG 7 and Aspire PLC are companies incorporated under the law of Malta.

19.     Neogames S.A. and Neogames Connect S.a.r.l. are foreign corporations incorporated under the laws of Luxembourg.

20.     Neogames Connect Ltd.  is a foreign corporation incorporated under the laws of Malta.

21.     Neogames S.A. wholly owns Neogames Connect S.a.r.l.

22.     Neogames Connect S.a.r.l. wholly owns Neogames Connect Ltd.

23.     Neogames Connect Ltd.  owns approximately 90% of Aspire PLC.

24.     Aspire PLC wholly owns Aspire Ltd., AG Communications and AG 7.

25.     In addition to shared ownership over each other, Aspire PLC and Neogames share common significant shareholders, specifically, Barak Matalon and Aharon Aran.  Aran was also a member of Aspire PLC's audit committee.

26.     The ownership structure is as follows:



27.     Prior to 2014, however, Neogames was a subsidiary of Aspire PLC.  Neogames spun off in 2014 to become an independent company.

28.     While a subsidiary of Aspire PLC, Neogames owned and operated certain of Aspire PLC's B2C Assets.

29.     Although Neogames was an "independent" company after its spin off, it continued to share common ownership, officers and directors with the Aspire Defendants, and to operate B2C Assets in conjunction with the Aspire Defendants.

30.     The Aspire Defendants continued to use "Neogames" as a d/b/a for certain assets in certain jurisdictions at times relevant to this litigation.

31.     In 2022, Neogames, through Neogames Connect, acquired approximately 90% of the shares of Aspire PLC.

32.     The Aspire Defendants and Neogames have continued to share, and currently share, common officers and directors. Tsachi Maimon ("Maimon") (a/k/a "Isaac Maimon") is and was the CEO of Aspire PLC at all times relevant to this dispute, who made affirmatively misleading statements and/or authorized misleading or fraudulent conduct on behalf of all Aspire Defendants, and who signed the agreements on behalf of the Aspire Defendants.

33.     In addition to being the CEO of Aspire PLC at times relevant to this litigation, Maimon has served and/or is currently serving as a director of Aspire PLC, and a director and officer of AG Communcations, AG 7 and Aspire Ltd.

34.     Maimon is also currently the President of Neogames S.A. On information and belief, Maimon serves as an officer of Neogames Connect.

35.     Maimon previously worked for Neogames as an officer and/or as part of management when Neogames was a subsidiary of Aspire PLC.

36.     Quincy Raven ("Raven") is a former executive of Aspire PLC.   Raven is a current executive of Neogames.

37.     Motti Gil ("Gil") was the CFO of Aspire PLC at all times relevant ot this litigation.  Gil was also a director of AG 7.

38.     In his role as CFO, Gil made affirmatively misleading statements and/or

authorized misleading or fraudulent conduct on behalf of all Aspire Defendants, or, alternatively, knew or should have known that statements contained with the Aspire Defendants financial disclosures omitted material facts and/or were materially misleading.

39. Gil is the current CFO of Neogames. On information and belief, Gil serves as an officer of Neogames Connect.

40. Matalon, a major shareholder of both Neogames and Aspire PLC, has also been a paid consultant to the directors of both Aspire PLC and Neogames at times relevant to this dispute.

41. Moti Malul ("Malul"), the current CEO of Neogames, was an executive of Neogames while it was a subsidiary of Aspire PLC.

42. At all times, Defendants acted as the agents of one other, such that one Defendant's actions, including the actions of officers, agents, employees and/or directors of each Defendant, is imputable to the other Defendants, and each Defendant is jointly liable for the conduct of the others.

43. Upon information and belief, defendants DOES I through X were, at all material times herein, individuals and/or entities residing in Clark County, Nevada and/or with sufficient minimum contacts to Clark County, Nevada to subject them to the jurisdiction of this Court. Currently, the names of DOES I through X are unkown to EBET, but EBET reserves the right to amend this Complaint once these names are known.

44. Upon information and belief, defendants ROE CORPORATIONS I through X are and were, at all material times, corporations and/or companies doing business in Clark County, Nevada, and/or with sufficient minimum contacts to Clark County, Nevada to subject them to jurisdiction of this Court. Currently, the names of the ROE CORPORATIONS I through X are unknown to EBET.

### C. *This Court has Specific Jurisdiction over Defendants*

#### 1. Neogames

45. Neogames is registered to do business in the State of Nevada under business license NV20212205081.

46.    Neogames is licensed and regulated by the Nevada Gaming Commission and Nevada Gaming Control Board.

47.    Neogames has designated a registered agent in Nevada to receive service of process.

48.    Maimon, Gil, Matalon and Aran are listed as directors of Neogames, and Neogames has provided a Nevada address at which these directors may be contacted in Nevada to the Nevada Secretary of State.

49.    Raven, a current executive of Neogames, lives in Las Vegas, Nevada.

50.    On its website, Neogames advertises that Neogames provides iGaming services to certain Nevada gaming companies.

51.    Neogames Connect provides Neogames' iLottery and certain of Neogames iGaming services to Nevada gaming companies.

52.    Neogames and Neogames Connect market their products to Nevada residents.

53.    Neogames attends the Global Gaming Exposition in Las Vegas, Nevada, for the specific purpose of marketing its products to Nevada residents.

54.    Neogames and/or Neogame Connect provide iGaming services to Nevada residents, and direct their products into Nevada's stream of commerce.

55.    As the alter ego of Neogames Connect, Neogames' contacts with Nevada are imputable to Neogames Connect and vice versa.

56.    Neogames' agents' contacts are imputable to Neogames such that this Court has specific and/or general jurisdiction over Neogames and Neogames Connect.

          2.    **The Aspire Defendants**

57.    Aspire PLC has an office located in Nevada at 58 Sawgrass Court, Las Vegas, Nevada 89113.  Aspire PLC advertises this office location to its shareholders and to international regulatory agencies as a United States office of Aspire PLC.

58.    Raven, an executive of Aspire PLC at times relevant to this litigation, lives in Las Vegas, Nevada.

59.    Maimon and Gil, respectively, the CEO and CFO of Aspire PLC at times relevant

1    to this litigation, and Matalon and Aran, directors and owners of Aspire PLC at times relevant to

2    this litigation, have provided a Nevada address at which these directors may be contacted in

3    Nevada to the Nevada Secretary of State.

4          60.      The Aspire Defendants, through themselves and their subsidiaries and/or affiliated

5    companies, provide or did provide iGaming services to players in Nevada at times relevant to

6    this litigation.

7          61.      The Aspire Defendants, through themselves and their subsidiaries and/or affiliated

8    companies, market their services to Nevada citizens.

9          62.      The Aspire Defendants have attended the Global Gaming Exposition in Las

10   Vegas, Nevada, in order to directly market their products to Nevada citizens.

11         63.      Aspire PLC advertises that it provides iGaming services to Nevada entities and

12   gaming companies on its website.

13         64.      As the alter egos and agents of each other, each Aspire Defendant's contacts with

14   Nevada are imputable to the other, such that this Court has specific and/or general jurisdiction

15   over the Aspire Defendants.

16         **3.      Aspire PLC Consented to Jurisdiction in Nevada**

17         65.      As explained further below, the Aspire Defendants and EBET entered into a

18   series of agreements between October 1, 2021 and November 29, 2021.  The last agreement

19   entered into between the Aspire Defendants and EBET was a promissory note (the "Note").

20         66.      The Note states it was signed and executed in "Las Vegas, Nevada."

21         67.      Paragraph 4.6 of the Note states:

22         **THIS NOTE SHALL BE ENFORCED, GOVERNED BY AND CONSTRUED IN
           ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA APPLICABLE
23         TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN
           SUCH STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF
24         LAWS.  THE BORROWER HEREBY SUBMITS TO THE EXCLUSIVE
           JURISDICTION OF THE UNITED STATES FEDERAL AND STATE COURTS
25         LOCATED IN CLARK COUNTY, NEVADA WITH RESPECT TO ANY DISPUTE
           ARISING UNDER THIS NOTE, THE AGREEMENTS ENTERED IN
26         CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED
           HEREBY OR THEREBY.  BOTH PARTIES IRREVOCABLY WAIVE THE
27         DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF
           SUCH SUIT OR PROCEEDING. . . .**

28

68.     Paragraph 4.6 of the Note supersedes prior venue and jurisdiction clauses in the other agreements, by its plain language.

69.     Maimon, on behalf of Aspire PLC, signed the Note.

70.     The Note expressly requires that "any dispute arising" from the "Note" and "the agreements entered in connection" with the Note must be brought in Nevada.

71.     The agreements entered into in connection with the Note are: (1) a Share Purchase Agreement (the "SPA"), (2) two Operator Services Agreements (the "OSAs"), and (3) a Transitional Services Agreement (the "TSA").   These are discussed below.

72.     The Aspire Defendants knew, or should have known, that its ultimate agreements with EBET would affect and did affect EBET in its principal place of business in Nevada, as EBET is headquarted in Nevada and is a citizen of Nevada.

73.     Under the plain language of the Note, Aspire PLC consented to jurisdiction in Nevada for disputes arising from the Note, the SPA, the OSAs, and the TSA.

74.     Under the plain language of the Note, Aspire PLC waived its defense of forum non conviens in Nevada for any disputes arising under the SPA, the OSAs, and the TSA.

75.     As the agent and/or alter ego of all Aspire Defendants, Aspire PLC's waiver and agreement are attributable and binding upon all Aspire Defendants, such that jurisdiction and venue are proper in this Court.

## GENERAL ALLEGATIONS

**I.      NEOGAMES AND ASPIRE CONSPIRE TO OFFLOAD B2C ASSETS.**

    **A.     *Neogames Needs Aspire to Offload its B2C Assets***

76.     EBET incorporates the prior paragraphs as if fully set forth herein.

77.     When Neogames was a subsidiary of Aspire PLC, it owned and/or operated some, if not all, of the B2C Assets that were ultimately transferred to EBET.   Neogames advertised on its website at that time that these B2C Assets were assets and services owned and/or operated by Neogames.

78.     Neogames knew, or should have known, of the financial profitability of these B2C Assets, as well as the costs associated with marketing these assets to consumers.

79. When Neogames left Aspire PLC in 2014, these B2C Assets remained with Aspire PLC and became the property of the Aspire Defendants.

80. On information and belief, in or around 2021, Neogames was hoping to be acquired by a third party.

81. On information and belief, Neogames was also, at that time, negotiating and/or in discussion concerning its purchase of approximately 90% of Aspire PLC's stock.

82. Neogames knew the financial condition of the Aspire Defendants' B2C Assets because Neogames had formerly owned and operated them, Neogames' current CEO was the same CEO who had been at Neogames while it was a subsidiary of Aspire PLC, and Aspire PLC's CEO Maimon was a former management team member and/or executive of Neogames.

83. Neogames also knew, or should have known, that its acquisiton by a third party would require certain disclosures to the third party, and may result in certain regulatory scrutiny concerning Neogames' subsidiaries.

84. Neogames knew, or should have known, that disclosures related to Aspire PLC's B2C Assets could reveal Aspire PLC's fraudulent EBITDA inflations and unlawful practice of defrauding and underpaying third-party vendors.

85. Thus, if Neogames was to successfully market itself and/or be acquired by a third party, it would not be in Neogames' best interest to acquire Aspire PLC unless Aspire PLC divested itself of these problematic B2C Assets.

**B.** ***The Aspire Defendants Enter into Negotiations with EBET***

86. Enter EBET, a company that at the time was focused on developing esports technology applications.  In or around the spring and summer of 2021, EBET had recently completed a successful IPO and was seeking accretive EBITDA generating acquistion targets with signficant player databases in the gaming business.

87. In the spring of 2021, Aspire PLC and EBET began discussions concerning EBET's potential acquisition of the Aspire Defendants' B2C Assets.

88. On or about May 27, 2021, Aspire and EBET entered into a non-binding letter of intent that set forth the basic terms of a possible agreement, and established a due diligence

period.

89.     Under this letter of intent, the Aspire Defendants agreed to transfer certain B2C Assets to EBET.

90.     The Aspire Defendants further agreed to transfer complete customer databases in all territories in which the B2C Assets (websites) are operated.

91.     The Aspire Defendants also agreed to transfer the front-end code of the websites, as well as all contracts with the Aspire Defendants' marketing vendors related to the B2C Assets.

92.     EBET tentatively agreed to pay the Aspire Defendants 60 Million Euro for these assets, subject to EBET's ability to confirm the assets' value through due diligence.

93.     The Aspire Defendants requested that, if EBET ultimately purchased the B2C Assets, the Aspire Defendants would continue to provide certain services in connection with the B2C Assets for a minimum of three years.

94.     EBET requested, and Aspire agreed, that EBET operate the B2C Assets under the Aspire Defendants' gaming licenses in the territories in which the Aspire Defendants were operating, pursuant to the applicable laws and regulations of those territories.

95.     The Aspire Defendants also requested that EBET hire and retain certain employees of the Aspire Defendants who supported the B2C Assets.

96.     Maimon, on behalf of Aspire PLC, signed the letter of intent.

**C.      *The Aspire Defendants Mislead EBET During Due Diligence.***

97.     Between May 27, 2021 and October 1, 2021, EBET performed due diligence to evaluate whether to enter into formal agreements with the Aspire Defendants to purchase the B2C Assets.

98.     As part of this due diligence, EBET requested financial data from the Aspire Defendants related to the revenue and associated operating and marketing expenses to determine the profitability, or EBITDA, of the B2C Assets.

99.     The Aspire Defendants, through Maimon and other officers with authority to speak on behalf of all the Aspire Defendants, represented to EBET orally and on multiple occassions between May 27, 2021 and October 1, 2021, that the annual EBITDA of the B2C

Assets was approximately $8.2 million. The Aspire Defendants, through Maimon and other officers with authority to speak on behalf of all the Aspire Defendants, further orally represented that the revenue of the B2C Assets was approximately $73.9 million. In addition to making these representations orally, Maimon and other officers of the Aspire Defendants authorized the affirmation of these representations in written information provided to EBET in a virtual data room accessible to EBET beginning on or about June 1, 2021.

100.     During the due diligence period, between May 27, 2021 and October 1, 2021, the Aspire Defendants represented to EBET, through Maimon and other officers with authority to speak on behalf of all the Aspire Defendants, that the financial information provided to EBET by the Aspire Defendants, including as to the Aspire Defendants' operating costs for the B2C Assets, was accurate. In addition to making these representations orally, Maimon and other officers of the Aspire Defendants authorized the affirmation of these representations in written information provided to EBET in a virtual data room accessible to EBET beginning on or about June 1, 2021.

101.     The financial information that the Aspire Defendants provided to EBET came in the form of profit and loss statements, audited and unaudited carve out financials and other financial backup information, which was provided to EBET directly from the Aspire Defendants' employees, officers and/or agents.

102.     Based on the financial information provided to EBET by the Aspire Defendants, EBET expected to purchase B2C Assets associated with an annual EBITDA of approximately $8,000,000.

103.     Between May 2021 and October 2021, the Aspire Defendants also represented to EBET, through Maimon and other officers, that the Aspire Defendants were transferring approximately 1.2 million genuine player accounts. The number of player accounts was a key driver of the acquisition because EBET planned to cross-market its esports assets to these consumers. In addition to making these representations orally, Maimon and other officers of the Aspire Defendants authorized the affirmation of these representations in written information provided to EBET in a virtual data room accessible to EBET beginning on or about June 1, 2021.

104.     The Aspire Defendants, through employees, officers and/or agents, provided EBET with a number of purported genuine player accounts for the B2C Assets, gave PowerPoint presentations containing this number, and approved press releases which corroborated the representations made by the Aspire Defendants as to the number of player accounts being transferred.

105.     During this time period, the Aspire Defendants also provided to EBET information related to their gaming licenses in the territories in which they were operating the B2C Assets.  The Aspire Defendants represented to EBET, both orally and through the documents provided in the virtual data room, that the Aspire Defendants were licensed and operating in key markets.

106.     Specifically, the Aspire Defendants provided EBET information stating that AG Communications held gaming licenses in Denmark, the United Kingdom and Sweden.

107.     The Aspire Defendants provided further information to EBET representing that Aspire PLC owned other subsidiaries with gaming licenses in Portugal and Ireland.

108.     The Aspire Defendants also provided information to EBET that Aspire Ltd. held a gaming license in Malta.

109.     The Aspire Defendants further represented to EBET, orally and in writing, multiple times throughout the due diligence period, that AG 7 was in the process of obtaining a gaming license in Germany.

110.     Germany was a key market for EBET, as it is a highly profitable territory and was anticipated to comprise at least one-third of the B2C Assets' revenue.

111.     Germany had previouly been an "unregulated" market which permitted the Aspire Defendants to operate the B2C Assets under Aspire Ltd.'s Malta license.

112.     Had EBET known that the Aspire Defendants' B2C Assets had nowhere near the EBITDA the Aspire Defendants were representing, that the number of genuine player accounts was only a fraction of what was represented, and that AG 7 would not obtain a German gaming license, EBET would never have agreed to purchase the B2C Assets.

**D.     *EBET is Fraudulently Induced to Acquire the Aspire Defendants' B2C Assets***

113. Unaware of the Aspire Defendants' materially false statements and/or omissions, EBET agreed to enter into a formal transaction with the Aspire Defendants to purchase the B2C Assets.

114. To facilate the deal, Aspire PLC created a special purpose entity, Karamba Limited ("Karamba").

115. The Aspire Defendants were equal owners of Karamba.

116. On October 1, 2021, EBET and its wholly-owned subsidiary Esports Product Technologies Malta, Ltd., entered into the SPA with the Aspire Defendants whereby EBET purchased all of the shares of Karamba from the Aspire Defendants.

117. Under the SPA between EBET and Aspire: (1) EBET would purchase all shares of Karamba; (2) the Aspire Defendants would transfer the B2C Assets to Karamba under an asset purchase agreement (the "APA"); (3) the Aspire Defendants would provide continuation of certain services in order to continue operation of the B2C Assets with minimal disruption to Karamba under the Operator Services Agreement (the "OSA"); and (4) the Aspire Defendants would enter into a Transition Services Agreement (the "TSA") to facilitate a migration plan of the B2C Assets.

118. Under Paragraph 3.1 of the SPA, EBET agreed to a purchase price of 65,000,000 Euros. The 65,000,000 Euro purchase price was to consist of: (1) 50,000,000 Euro in cash; (2) 10,000,000 Euro by way of a promissory note; and (3) 5,000,000 Euro worth of newly issued common stock of EBET.

119. Under Paragraph 6.4 of the SPA, Aspire represented that it was "in compliance in all material respects with all laws, ordinances, regulations and orders of all government entities or authorities," and that Aspire had filed accurate and complete reports with all regulatory authorities.

120. At the time of the SPA, the Aspire Defendants were operating the B2C Assets in Germany; thus, under Paragraph 6.4 the Aspire Defendants represented that they were in compliance with German regulations on gaming and would continue to comply with German regulations on gaming, i.e., that the Aspire Defendants would obtain a German gaming license.

121. Under Paragraph 6.9, the Aspire Defendants agreed to provide EBET with audited

1    and unaudited carve-out balance sheets.  The Aspire Defendants expressly represented and

2    warranted that it "maintained materially accurate books and records reflecting the assets and

3    liabilities" of the Aspire Defendants and that the information in these statements "accurately lists

4    and fairly presents, in all material respects, the financial condition and operating results of" the

5    Aspire Defendants' B2C Assets.

6           122.     Under Paragraph 6.14, the Aspire Defendants agreed to provide EBET with

7    access to a data room, which the Aspire Defendants represented was "accurate in all material

8    respects,"  The Aspire Defendants further represented that "all information provided to [EBET]

9    in relation to [EBET's] due diligence requests, including information not provided in the Data

10    Room, is, to the knowledge of [the Aspire Defendants], accurate and complete in all material

11    respects."

12          123.     The SPA is dated October 1, 2021.

13          124.     After the SPA was executed, EBET and Aspire entered into the promissory note

14    for 10,000,000 Euro on or about November 29, 2021 (the "Note").  The Note was required to

15    complete the SPA.

16          125.     The Note states it was signed and executed in "Las Vegas, Nevada."

17          126.     The first paragraph of the Note states that it is being executed pursuant to the

18    terms of the SPA.

19          127.     As set forth above, Paragraph 4.6 of the Note provides that "any dispute arising

20    under this Note, the agreements entered into in connection herewith or the transactions

21    contemplated hereby or thereby" shall be brought in Nevada.

22          128.     By its plain language, the Note superseded the SPA's venue and arbitration clause

23    by requiring that all disputes arising from "the agreements entered into connection herewith or

24    the transactions contemplated hereby or thereby" as the SPA is an agreement entered into

25    connection with the Note and the underlying transaction.

26          129.     By its plain language, the Note required that "any dispute arising under this

27    Note," and "the agreements entered in connection" with the Note must be brought in Nevada.

28          130.     By its plain language, the Aspire Defendants consented to jurisdiction in Nevada

1  under the Note and all related agreements, including, but not limited to, the SPA, the APA, the

2  TSA and/or the OSA.

3       131.    By its plain language, the Note waived the parties' defense of forum non

4  conveniens in Nevada.

5       132.    Maimon, on behalf of Aspire PLC, signed the Note.

6       133.    In addition to the SPA and Note, on November 29, 2021, EBET and the Aspire

7  Defendants entered into several more agreements to close the transaction.

8       134.    EBET, Karamba, and the Aspire Defendants entered into the TSA, as noted

9  above.

10       135.    Concurrent with the SPA closing, EBET, Karamba, and the Aspire Defendants

11  also entered into two separate operator service agreements, each an OSA.  The purpose of the

12  OSA's was to ensure the iGaming platform could be properly operated with the appropriate

13  licenses or otherwise such that the Aspire Defendants could lawfully maintain the operation of

14  the websites purchased by EBET and service same. One OSA pertained to markets regulated by

15  the Great Britain Gambling Commission and the Danish Gambling Authority, for which the

16  Aspire entities had remote gaming licenses (the "Regulated Markets Operator Services

17  Agreement"). The other OSA pertained to the operation of the EBET websites in unregulated

18  markets utilizing the Aspire license with the Maltese Gaming Authority, for which the Aspire

19  Defendants' Maltese remote gaming licenses were permissible (the "Unregulated Markets

20  Operator Services Agreement").

21       136.    EBET entered into the OSA and TSA at the Aspire Defendants' express request

22  that the Aspire Defendants perform these services rather than EBET or a third-party provider.

23       137.    EBET would not have agreed to enter into the SPA and the Note absent a service-

24  level agreement, similar to the OSAs and TSA, in place.

25       138.    Had EBET known that the Aspire Defendants would not abide by their

26  contractual obligations under the OSAs and TSA, EBET would not have agreed to enter into the

27  SPA and the Note.

28       **E.**     *Neogames and the Aspire Defendants Achieve Their Unlawful Goal*

139.     The Aspire Defendants continued to falsely represent and/or materially omit key information to EBET following the execution of the SPA, APA, OSAs, TSA and the Note.

140.     On October 1, 2021, the day that EBET signed the SPA, EBET issued a press release stating that the EBITDA of the B2C Assets was $8.2 million.   This press release was approved prior to issuance by the Aspire Defendants, and specifically by Maimon.

141.     In this press release, EBET and the Aspire Defendants also announced that EBET was purchasing 1.25 million active player accounts from the Aspire Defendants.

142.     Maimon, the then-CEO of Aspire PLC, is quoted in the press release.  Maimon reviewed and expressly approved the contents of the press release issued by EBET.

143.     At no time did Maimon or any other officer of Aspire correct EBET and inform it that the EBITDA of the B2C Assets was far less than $8.2 million.

144.     At no time did Maimon or any other officer the Aspire Defendants correct EBET and inform it that it would be acquiring far less than 1.25 million active player accounts.

145.     On December 1, 2021, EBET issued a second press release again stating that the EBITDA of the B2C Assets was $7.9 million.   This press release was approved prior to issuance by the Aspire Defendants, and specifically, by Maimon.

146.     This press release again announced that EBET had acquired 1.25 million player accounts.

147.     Maimon was also quoted in this press release, and also personally reviewed and approved it.  At no point did Maimon inform EBET that it was acquiring assets worth substantially less given the assets were far less profitable, and/or that it was acquiring far fewer player accounts than represented.

148.     In its annual report to investors and regulators for 2021, Aspire PLC announced that it had divested itself of its B2C Assets as of December 2021.

149.     Aspire PLC stated that by doing so, it made the Aspire Defendants far "more profitable."

150.     Mere weeks after the Aspire Defendants divested themselves of the B2C Assets, Neogames announced its offer to acquire Aspire PLC on or about January 17, 2022.

151. Neogames announced the completion of its tender offer, and its acquisition of approximately 90% of Aspire PLC's shares, in June 2022.

152. Maimon, the CEO of Aspire PLC, became the President of Neogames.

153. In July 2023, Neogames announced shareholder approval of Neogames' acquisition by a third party.

154. Thus, by July 2023, Neogames and the Aspire Defendants achieved their goal: offload the problematic B2C Assets, infuse Aspire PLC with cash, acquire Aspire PLC, and market Aspire PLC as a highly profitable subsidiary of Neogames to potential purchasers of Neogames.

## II.   EBET DISCOVERS THE ASPIRE DEFENDANTS' BAIT AND SWITCH

### A.   *EBET Discovers that the Aspire Defendants Fraudulently Underpaid Affiliates for Years, in Order to Artificially Inflate the Aspire Defendants' Stated EBITDA.*

155. EBET incorporates the preceding paragraphs as if fully set forth herein.

156. When EBET took over operations of the B2C Assets, it was not able to match the EBITDA that the Aspire Defendants had reported.

157. Then, approximately six months after entering into the SPA and the Note, EBET began discovering discrepancies in the affiliate databases the Aspire Defendants had transitioned to EBET.

158. These discrepancies prompted further inquiry by EBET, and EBET was informed by former employees of the Aspire Defendants that the Aspire Defendants fraudulently and intentionally understated their operational costs in order to fraudulently inflate their EBITDA.  In reality, the Aspire Defendants' true operating costs were far higher than was represented to EBET or able to be known by EBET at the time of the closing of the transaction, resulting in EBET having purchased B2C Assets worth significantly less than the amounts for which EBET agreed to pay.

159. The Aspire Defendants were able to do this by manipulating the data entered into its software system that paid out commissions to affiliates.

160. An "affiliate" is a company that promotes the Aspire Defendants' advertisements

for their B2C assets.  They are sometimes also referred to as "publishers."  Affiliates are third party vendors that own or operate websites, mobile apps or software.  The Aspire Defendants would enter into an agreement with the affiliates to display advertisements for the Aspire Defendants' products, websites and games on the affiliate's website, app or software, in the hope that the users of the affiliate's products would click on the Aspire Defendants' advertisements and become registered iGaming players on the Aspire Defendants' platforms.[1]

161.    The Aspire Defendants contracted with multiple affiliates internationally to provide this service.  Although the terms of these agreements varied, the general construct of the Aspire Defendants' agreements with affiliates was that the Aspire Defendants would pay the affiliate a fee or commission based upon the amount of players (or traffic) that affiliate was able to direct to the Aspire Defendants platforms.  These fees or commissions would only be paid, however, for the players who both registered AND deposited (i.e., paid to wager) certain minimum monetary amounts with the Aspire Defendants.

162.    The minimum monetary amount is referred to as a "baseline."  While baselines and payment structures varied, the general manner in which each affiliate is paid required that any player meet the baseline before a commission or fee would be owed to the affiliate.

163.    These affiliate payments are a part of the operating cost of an iGaming company, which must be subtracted from revenue (along with all other operating costs and overhead) in order to accurately determine a company's profitability and value.

164.    The Aspire Defendants had been fraudulently manipulating the data entered into its affiliates database for years in order to underpay affiliates and falsely understating the Aspire Defendants' operating costs.

165.    The Aspire Defendants did this by using its own version of affiliate software which only permitted affiliates to see (1) how many players registered with Aspire from the affiliate's platform, (2) how many players "qualified," i.e., deposited the baseline, and (3) what money the affiliate was owed based upon those numbers.

---

[1] An example of this would be the popular mobile app game Candy Crush Saga.  Aspire could contract with Candy Crush Saga to have an advertisement pop up upon a player's completion of a level.  If the player clicked the ad, the player would be diverted to Aspire's platforms.

166.     The Aspire Defendants' software did not permit affiliates to view the players' individual statistics in order to determine what player was depositing what amount and when.  In contrast, most other iGaming companies, including EBET, use an affiliate software that provides this information.

167.     The Aspire Defendants, however, used their own version of software to hide their fraudulent underpayment to affiliates.  They were able to do this by manipulating the baseline. Essentially, if the Aspire Defendants and the affiliate agreed that the baseline was $15, meaning a player had to both register and deposit a minimum of $15 before the affiliate was entitled to a commission or fee, then the Aspire Defendants should have entered that $15 baseline into the affiliate's database.

168.     What the Aspire Defendants actually did was enter the agreed-upon minimum threshold into their database but then, for short time periods, the Aspire Defendants would raise the baseline threshold to a higher amount before dropping it back down to the agreed-upon amount.  For example, if the baseline was $15, the Aspire Defendants would enter that number into their database.  But then, for a period of a few days or weeks, the Aspire Defendants would internally raise the baseline from $15 to $25, before dropping it back down to $15.

169.     By doing this, the Aspire Defendants were able to disqualify players who would otherwise have qualified from the pool of players for which the Aspire Defendants had to pay the affiliate.  The affiliates had no access to the player deposit data and as such had no ability to determine whether or not they should have been paid for any player deposit activity.  The affiliates solely relied on Aspire Defendants to report deposit data.

170.     But, because the affiliate could see trends in the reports it did have access to, the Aspire Defendants only manipulated the baseline for short, unpredictable periods, so as not to attract attention to their fraudulent underpayment of affiliates.

171.     The Aspire Defendants' former employees showed EBET that, in one month alone, and for only three affiliate marketers, this manipulation artificially deflated the Aspire Defendants' actual operating costs by 600,000 Euros.

172.     As an illustration and one example only, this would mean that if 600,000 Euros

are a lower minimum average of the deflated operating costs, then the Aspire Defendants were cutting out at least ***7,200,000 Euros a year*** from a company that they were representing only had $7,900,000 of annual EBITDA.

173.    According to the former employees of the Aspire Defendants, this fraudulent manipulation of the baseline was done at the direction of and/or with knowledge of the Aspire Defendants' officers and directors, including Maimon.

174.    EBET promptly informed the Aspire Defendants of what it had learned.

175.    The Aspire Defendants induced EBET to enter into a Mutual Release and Settlement Agreement ("Release"), because the Aspire Defendants wanted EBET to release the Aspire Defendants from their specific fraudulent affiliate payment manipulation liability to the extent of Aspire's exposure to EBET, all in exchange for certain considerations Aspire promised to provide to EBET.   Not only did Aspire totally fail to provide or perform on such consideration or promises of performance related thereto, but it was at all times impossible for Aspire to perform on what they promised to do in exchange for the Release.

176.    At the time EBET discovered the Aspire Defendants' fraud, Aspire PLC was majority-owned by Neogames, but Neogames had not yet finalized the agreement with the third-party purchaser.

177.    As consideration for the Release, the Aspire Defendants concurrently entered a first amendment to the TSA with a promise to provide additional services and assistance to EBET to support enhanced financial performance of the B2C Assets.

178.    The First Amendment to the TSA materially provided that the Aspire Defendants would provide EBET with a plan for a sustainable and profitable business.

179.    EBET and the Aspire Defendants then entered into a second amendment to the TSA in which the Aspire Defendants extended the term of the TSA.

180.    The Second Amendment was entered into on November 2022.

181.    Under the amended TSA, the Aspire Defendants informed EBET that it was because EBET's overhead was too high and that EBET should reduce personnel.

182.    Even after cutting back on operating costs, however, EBET was unable to attain

anywhere near the EBITDA that the Aspire Defendants had purportedly obtained from the B2C Assets.

183.    The Aspire Defendants, through Maimon and others, repeatedly represented to EBET, multiple times during telephone conversations that the B2C Assets could achieve the EBITDA the Aspire Defendants represented.  Despite these representations, however, EBET ultimately learned that the only way to achieve the EBITDA the Aspire Defendants represented would be to engage in the same fraudulent conduct as the Aspire Defendants, which EBET was unwilling to do.

184.    Aspire Defendants never provided what was materially bargained for by EBET under under the First or Second TSA—which was a sustainable plan for a profitable business, and as a result the release is void for failure of consideration.   In fact, Aspire Defendants never intended to provide such consideration because they knew at all times it was impossible to create a plan for profitabilty without continuing its longstanding fraudulent affiliate baseline manipulation practices.  The Release was a sham transaction intended solely to provide Aspire relief from liability exposure and with no intended benefit or consideration to EBET for same.

185.    Upon execution of the First and Second Amendments to the TSA, the Aspire Defendants knew at all times that they could not provide the consideration for the release because they could never in fact produce a  plan of profitability with EBET.

186.    On information and belief, the Aspire Defendants induced EBET to enter into the Release to keep EBET quiet during the period of time in which Neogames was negotiating its purchase by a third party.

**B.**    ***EBET Discovers that the Aspire Defendants Did Not Transfer EBET the Number of Represented Genuine Player Accounts.***

187.    In May 2023, EBET discovered that the Aspire Defendants had also lied about the number of actual player accounts that were being transferred.

188.    These player accounts are one of the only pieces of tangible property that EBET was actually to receive in exchange for the funds EBET was paying to Aspire under the SPA. These player accounts were an important factor in determining the value EBET was willing to

1    pay under the SPA.

2        189.    EBET was not transferred the player account databases until after December 1,

3    2021.

4        190.    When EBET was finally transferred the databases, EBET learned for the first time

5    that it was only acquiring approximately 800,000 player accounts.  This is far less than the 1.25

6    million accounts the Aspire Defendants previously represented would be purchased.

7        191.    Specifically, the database revealed that the Aspire Defendants were transferring

8    1,223,254 player accounts.  Of this 1,223,254 total, only 1,122,398 player accouts had valid

9    emails (i.e., with the format: username@domain.tld).  Further inspection revealed that many of

10   these were not genuine player accounts, and that 320,473 had ng.com email accounts, which, on

11   information and belief, is a Neogames email address.  In all, only 801,925 of the accounts were

12   genuine player accounts.

13       192.    EBET then learned that of these accounts, many of these accounts had little or no

14   value because they did not have names or a city associated with the account.

15       193.    The accounts with Neogames email addresses primarly came from a platform

16   previously operated by Neogames while it was a subsidiary of Aspire PLC.

17       194.    On information and belief, the Aspire Defendants and/or Neogames moved

18   inactive or otherwise fake player accounts into Neogames email addresses in order to inflate the

19   number of player accounts that appear in the database, thereby inflating the value of the B2C

20   Assets, and overstating EBET's ability to cross-market its esports offerings and remarket its

21   traditional iGaming offerings to these consumers.  EBET's ability to cross-market its esports

22   offiering was a primary goal of this transaction.

23       195.    At no point did the Aspire Defendants ever inform EBET that the player

24   databases contained inactive, test, and/or fake player accounts.

25       196.    To the contrary, the Aspire Defendants expressly represented that it was

26   transferring EBET genuine player accounts, i.e. accounts associated with actual, live players.

27   **C.**    ***The Aspire Defendants Do Not Get Their German Gaming License***

28       197.    When EBET and the Aspire Defendants were negotiating this deal, and entered into

the agreements, the Aspire Defendants were operating in Germany under Aspire Ltd.'s remote Malta gaming license.

198.   At that time, Germany was recognizing, and permitting, gaming companies to operate in its territory with valid Malta licenses.  However, shortly before or around the time of EBET's and the Aspire Defendants' negotiations, Germany announced it would move to regulate gaming within its territory.   This would require any gaming company that provided gaming in Germany to obtain a German gaming license.

199.   The Aspire Defendants represented to EBET that they would comply with German regulations and that AG 7 would obtain a German gaming license.

200.   Germany was a key market for EBET, representing a third of the revenue of the B2C Assets.

201.   On information and belief, two of the gaming licenses offered by German authorities are (1) a sports betting license, and (2) a casino license.  The casino license was the key license needed by EBET to operate the B2C Assets lawfully in Germany.

202.   On information and belief, the Aspire Defendants failed to pay a fee associated with a licensing application.

203.   On or around April 27, 2023, the Aspire Defendants notified EBET via telephone and email that the Aspire Defendants received notice from the German gaming authority that the Aspire Defendants were to shut down operations within 10 days from April 25, 2023 unless it was able to legally operate in Germany.

204.   The Aspire Defendants represented that they had been taking all measures to seek a license in Germany since before the EBET entities entered into the term sheet and subsequent agreement on October 1, 2021 and November 29, 2021, yet they missed a basic payment necessary for the completion of the licensing process.

205.   Notably, the Aspire Defendants' failure to obtain a German gaming license was not due to the risk of a regulatory agency denying a license, but directly to the Aspire Defendants' own neglect in making a required payment and in meeting other German regulatory requirements.

206.   The German gaming authority shut down operations because the Aspire Defendants

were not licensed to operate in Germany and, as a result, the EBET entities have lost nearly one-third of their revenues.

**D.    The B2C Assets Underperform and Experience Issues, and the Aspire Defendants Fail to Address the Problem.**

208.    The Aspire Defendants asked to remain the back-end provider for the B2C Assets. The Aspire Defendants promised and agreed that it would ensure operational continuity.

209.    But for this promise and agreement, EBET would not have agreed to purchase B2C Assets without service-level assurances in place.

210.    Following the SPA, however, the Aspire Defendants failed to provide service at any commercially reasonable level of performance or operational continuity.

211.    Many of the B2C Assets began to experience frequent downtime, that EBET could not fix pursuant to the parties' agreements.  When EBET would notify the Aspire Defendants of the downtimes, the Aspire Defendants would deny that these occurred.

212.    The downtimes were more frequent than the Aspire Defendants represented in the diligence periods, and occurred during key player times.  As a result, EBET lost significant revenue from the downtimes.

213.    Rather than admit the downtimes were occurring, the Aspire Defendants, on information and belief, adopted a policy of plausible deniability.  The Aspire Defendants would deny the downtimes were happening, would force EBET to reach out multiple times, and would not respond to EBET until the downtime issues were mysteriously cured, at which point the Aspire Defendants would point out that there seemed to be no issues.

214.    In addition, the Aspire Defendants' front-end, core software and/or CRM database suffered some form of anomaly or incident whereby certain new registered users received unwanted emails and texts, and on notice from EBET, the Aspire Defendants have failed and refused to fix these issues. This resulted in EBET having to shut down its marketing efforts for some time until the situation was resolved, further harming EBET's revenue.

215.    On information and belief, the Aspire Defendants knew or should have known of these issues with the B2C Assets but failed to disclose them to EBET.

216.    On information and belief, the Aspire Defendants insisted on providing the operational and transitional services under the TSA and OSAs, in part, to ensure that EBET would not discover the issues with the B2C Assets and inflate its B2B revenues to be more attractive to potential acquirors.

## FIRST CAUSE OF ACTION
### (Fraud in the Inducement Against All Aspire Defendants- SPA and Note)

217.    EBET incorporates paragraphs 1-216 as though fully set forth herein.

218.    The Aspire Defendants made false representations to EBET regarding the actual EBITDA and operating costs of the B2C Assets, the number of player accounts, that they would comply with all regulatory laws needed to obtain and maintain a gaming license in Germany, and the efficacy and operational stability of their platforms.

219.    At the time the Aspire Defendants made these representations, they knew or should have known, that these representations were false and/or materially misleading.

220.    The Aspire Defendants made these representations in order to induce EBET to enter into the SPA and Note.

221.    At the time the Aspire Defendants made these representations, EBET did not know and could not have known that the Aspire Defendants' representations were false and/or materially misleading, and EBET justifiably relied upon on the Aspire Defendants' misrepresentations.

222.    But for the Aspire Defendants' misrepresentations, EBET would not have entered into the SPA and Note.

223.    As a proximate result of these misrepresentations, EBET has been damaged in an amount exceeding the jurisdictional limit and to be proven at trial.

224.    The Aspire Defendants have engaged in despicable conduct which was carried on with such a willful and conscious disregard of EBET's rights, and which has subjected EBET to cruel and unjust hardship. Accordingly, EBET is entitled to punitive and exemplary damages against the Aspire Defendants.

225.    EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct and is entitled to an award of its reasonable attorney fees and costs.

**SECOND CAUSE OF ACTION**
**(Rescission Against All Aspire Defendants – SPA)**

226.    EBET incorporates paragraphs 1-216 as though fully set forth herein.

227.    The Aspire Defendants made false representations to EBET regarding the actual EBITDA and operating costs of the B2C Assets, the number of player accounts, that they would comply with all regulatory laws needed to obtain and maintain a gaming license in Germany, and the efficacy and operational stability of their platforms.

228.    At the time the Aspire Defendants made these representations, they knew or should have known, that these representations were false and/or materially misleading.

229.    The Aspire Defendants made these representations in order to induce EBET to enter into the SPA.

230.    At the time the Aspire Defendants made these representations, EBET did not know and could not have known that the Aspire Defendants' representations were false and/or materially misleading, and EBET justifiably relied upon on the Aspire Defendants' misrepresentations.

231.    But for the Aspire Defendants' misrepresentations, EBET would not have entered into the SPA.

232.    Due to the Aspire Defendants' misrepresentations, EBET is entitled to rescind the SPA.

233.    As a proximate result of the rescission, EBET should be returned to the position it occupied prior to executing the contracts, and the 65 Million Euro purchase price should be returned.

234.    EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

**THIRD CAUSE OF ACTION**
**(Rescission Against All Aspire Defendants – Note)**

235.    EBET incorporates paragraphs 1-216 as though fully set forth herein.

236.    The Aspire Defendants made false representations to EBET regarding the actual EBITDA and operating costs of the B2C Assets, the number of player accounts, that they would

comply with all regulatory laws needed to obtain and maintain a gaming license in Germany, and the efficacy and operational stability of their platforms.

237. At the time the Aspire Defendants made these representations, they knew or should have known, that these representations were false and/or materially misleading.

238. The Aspire Defendants made these representations in order to induce EBET to enter into the Note.

239. At the time the Aspire Defendants made these representations, EBET did not know and could not have known that the Aspire Defendants' representations were false and/or materially misleading, and EBET justifiably relied upon on the Aspire Defendants' misrepresentations.

240. But for the Aspire Defendants' misrepresentations, EBET would not have entered into the Note.

241. Due to the Aspire Defendants' misrepresentations, EBET is entitled to rescind the Note.

242. As a proximate result of the rescission, EBET should be returned to the position it occupied prior to executing the contracts, and the 65 Million Euro purchase price should be returned.

243. EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

## FOURTH CAUSE OF ACTION
### (Rescission Against All Aspire Defendants – Release)

244. EBET incorporates paragraphs 1-75, 155-186 as though fully set forth herein.

245. The Aspire Defendants made false representations to EBET regarding the services they would provide as consideration for the Release.

246. At the time the Aspire Defendants made these representations, they knew or should have known, that these representations were false and/or materially misleading.

247. The Aspire Defendants made these representations in order to induce EBET to enter into the Release.

248.    At the time the Aspire Defendants made these representations, EBET did not know and could not have known that the Aspire Defendants' representations were false and/or materially misleading, and EBET justifiably relied upon on the Aspire Defendants' misrepresentations.

249.    But for the Aspire Defendants' misrepresentations, EBET would not have entered into the Release.

250.    The Aspire Defendants never provided the services they promised, and the Release is void for consideration.

251.    Due to the Aspire Defendants' misrepresentations, EBET is entitled to rescind the Release.

252.    EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

## FIFTH CAUSE OF ACTION
### (Breach of Contract Against All Aspire Defendants)

253.    EBET incorporates paragraphs 1-75, 116-132, 139-216 as though fully set forth herein.

254.    Valid contracts exist between EBET and the Aspire Defendants, namely, the Note, SPA and related agreements.

255.    EBET has performed all its obligations under each of the contracts.

256.    The Aspire Defendants breached the representations and warranties in the SPA by not providing EBET with compete and accurate information about the number of player accounts, providing inaccurate financials, and failing to take all necessary measures to obtain an iGaming license in Germany.

257.    As a proximate result of the Aspire Defendants' breaches of the above-referenced contractual representations and warranties, EBET has been damaged in an amount exceeding the jurisdictional limit and to be proven at trial.

258.    EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

## SIXTH CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against All Aspire Defendants)

259.    EBET incorporates paragraphs 1-75, 116-132, 139-216 as though fully set forth herein.

260.    Valid contracts exist between the EBET entities and the Aspire Defendants, namely, the Note, SPA and related agreements.

261.    EBET has performed all its obligations under each of the contracts.

262.    The Aspire Defendants performed in a manner that was unfaithful to the purposes of the agreement and deliberately contravened the intention and spirit of the parties' agreement by not providing EBET with compete and accurate information about the number of player accounts, providing inaccurate financials, and failing to take all necessary measures to obtain an iGaming license in Germany.

263.    As a proximate result of the Aspire Defendants' breaches of the implied covenant of good faith and fair dealing inherent in the SPA and Note, EBET has been damaged in an amount exceeding the jurisdictional limit and to be proven at trial.

264.    EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation against all Aspire Defendants)

265.    EBET incorporates paragraphs 1-216 as though fully set forth herein.

266.    The Aspire Defendants have a pecuniary interest in the transaction described in this complaint, including the SPA and Note, and the other related agreements (the OSA, APA, and TSA).

267.    In the course of their business, and in the furtherance of this transaction, the Aspire Defendants supplied false information for the guidance of EBET in its evaluation of whether to enter into this transaction with the Aspire Defendants.

268.    When the Aspire Defendants supplied this false information, the Aspire Defendants failed to exercise reasonable care or competence in obtaining, verifying or communicating this

information.

269.    As a result, EBET has been damaged in an amount exceeding the jurisdictional limit and to be proven at trial.

270.    At all times, the Aspire Defendants' conduct was willful, malicious, and fraudulent, such that punitive damages are appropriate.

271.    EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

## EIGHTH CAUSE OF ACTION
### (Alter Ego Against Aspire Defendants)

272.    EBET incorporates paragraphs 1-26, 32-44, 57-85, 96, 99-100, 103-104, 132, 140, 142-145, 147-154 as though fully set forth herein.

273.    Aspire Global PLC is the owner of defendants Aspire Ltd., AG Communications, and AG 7.

274.    The Aspire Defendants have, at relevant times, shared common ownership through common shareholders.   The Aspire Defendants have, at relevant times, shared common management and/or officers and, on information and belief, share common directors.

275.    There is such a unity of interest between the Aspire Defendants that one is inseparable from the other.   Aspire PLC is so organized and controlled and its affairs are conducted in a manner that, in fact, renders each Aspire Defendant a mere instrumentality or adjunct of the other.

276.    Adherence to the corporate distinction between the Aspire Defendants would sanction fraud and promote injustice under the facts of this case.

277.    Due to the alter ego nature of the Aspire Defendants' relationship, each of their contacts and agents are properly imputable to all others.

278.    Due to the alter ego nature of the Aspire Defendants' relationship, a justiciable and ripe dispute has arisen between EBET and Aspire concerning whether each Aspire Defendant is an alter ego of the others, such that each Aspire Defendant's wrongful conduct is imputable to the others.

279.   EBET is entitled to a declaratory judgment from this Court finding that the Aspire Defendants are each the alter ego of the other.

280.   EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

### NINTH CAUSE OF ACTION
**(Alter Ego Against Defendant Neogames)**

281.   EBET paragraphs 1-56, 76-85, 96, 99-100, 103-104, 132, 140, 142-145, 147, 150-154 as though fully set forth herein.

282.   Neogames is the owner of defendant Neogames Connect, S.a.r.l., and Neogames Connect Limited.

283.   The Neogames Defendants have, at relevant times, shared common ownership through common shareholders.   The Neogames Defendants have, at relevant times, shared common management and/or officers and, on information and belief, share common directors.

284.   There is such a unity of interest between the Neogames Defendants that one is inseparable from the other.  Neogames is so organized and controlled and its affairs are conducted in a manner that, in fact, renders each Neogames Defendant a mere instrumentality or adjunct of the other.

285.   Adherence to the corporate distinction between the Neogames Defendants would sanction fraud and promote injustice under the facts of this case.

286.   Due to the alter ego nature of Neogames Defendants' relationships, each Neogames Defendant's contacts and agents are the other's contacts and agents and are properly imputable to each.

287.   Due to the alter ego nature of the Neogames Defendants' relationship, a justiciable and ripe dispute has arisen between EBET and Neogames concerning whether the Neogames Defendants are alter egos.

288.   EBET is entitled to a declaratory judgment from this Court finding that the Neogames Defendants are the alter ego of the other.

289.   EBET has been forced to retain counsel as a result of the Neogames Defendants'

wrongful conduct, and is entitled to an award of its reasonable fees and costs.

**TENTH CAUSE OF ACTION**
**(Alter Ego Against Aspire Defendants and Neogames)**

290.    EBET incorporates paragraphs 1-85, 96, 99-100, 103-104, 140-, 142-145, 147, 150-154 as though fully set forth herein.

291.    Neogames is the owner of defendant Aspire Global PLC, which in turn owns the remaining Aspire Defendants.

292.    Neogames and the Aspire Defendants have, at relevant times, shared common ownership through common shareholders.  Neogames and the Aspire Defendants have, at relevant times, shared common management and/or officers and, on information and belief, share common directors.

293.    There is such a unity of interest between Neogames and the Aspire Defendants that one is inseparable from the other.  Neogames is so organized and controlled and its affairs are conducted in a manner that, in fact, renders Aspire a mere instrumentality or adjunct of Neogames.

294.    Adherence to the corporate distinction between the Aspire Defendants and Neogames would sanction fraud and promote injustice under the facts of this case.

295.    Due to the alter ego nature of Neogames' and the Aspire Defendants' relationship, Neogames' contacts and agents are the Aspire Defendants' contacts and agents and are properly imputable to the Aspire Defendants.

296.    Due to the alter ego nature of Neogames' and the Aspire Defendants' relationship, a justiciable and ripe dispute has arisen between EBET and Neogames concerning whether Neogames is an alter ego of the Aspire Defendants, such that the Aspire Defendants' wrongful conduct is imputable to Neogames.

297.    EBET is entitled to a declaratory judgment from this Court finding that Neogames and the Aspire Defendants are the alter ego of the other.

298.    EBET has been forced to retain counsel as a result of Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

### ELEVENTH CAUSE OF ACTION
**(Conspiracy Against All Defendants)**

299.    EBET incorporates paragraphs 1-85, 96-216 as though fully set forth herein.

300.    Neogames and the Aspire Defendants acted in concert with the intent to accomplish an unlawful objective for the purpose of harming EBET.

301.    Neogames and the Aspire Defendants agreed and conspired to remove Aspire's problematic B2C Assets from Aspire to a third party, and receive cash, in order to make Neogames more attractive to a prospective purchaser.  Neogames and the Aspire Defendants further conspired to make the Aspire Defendants' B2B assets look better by requiring EBET to sign service agreements, thereby keeping what were B2C assets as B2B assets.

302.    Acting in concert, Neogames and the Aspire Defendants fraudulently induced EBET to purchase the Aspire Defendants' B2C Assets, by having the Aspire Defendants falsely represent to EBET the actual EBITDA and operating costs of the B2C Assets, the number of player accounts, that they would comply with all regulatory laws needed to obtain and maintain a gaming license in Germany, and the efficacy and operational stability of their platforms.

303.    On information and belief, Neogames facilitated the Aspire Defendants' fraudulent misrepresentations by assigning Neogames email addresses to fake and/or inactive player accounts, and by encouraging the Aspire Defendants to offload their B2C Assets to EBET.

304.    Following EBET's entry into the SPA and Note, Neogames acquired Aspire PLC, reuniting Neogames, a former subsidiary of Aspire PLC, with Aspire PLC, a former parent company of Neogames.

305.    Neogames then marketed itself to prospective third-party purchasers as an increasingly profitable company, engaged in fraudulent conduct to create profit, failed to maintain gaming licenses, and fraudulently induced EBET to purchase the B2C Assets.

306.    As a result, EBET has been damaged in an amount exceeding the jurisdictional limit and to be proven at trial.

307.    At all times, Defendants' conduct was willful, malicious and fraudulent such that punitive damages are appropriate.

308.    EBET has been forced to retain counsel as a result of Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs.

## TWELFTH CLAIM FOR RELIEF
### (Violation of Nevada Deceptive Trade Practices Act- Aspire Defendants)

309.    EBET incorporates paragraphs 1-75, 86-113, 139-216 as though fully set forth herein.

310.    EBET is a victim of consumer fraud pursuant to NRS 41.600(1) and NRS 41.600(2)(e), as a purchaser of the Aspire Defendants' assets and/or a competitor in the market.

311.    The Aspire Defendants have harmed EBET, and perpetrated a fraud, pursuant to their deceptive trade practice of fraudulently underpaying affiliates in order to falsely inflate EBITDA and misrepresenting the true nature and character of the assets being transferred to EBET, including, but not limited to, the number of player accounts.

312.    The Aspire Defendants knowingly made false representations as to the characteristics of the assets being transferred, including, but not limited to, the actual EBITDA and operating costs of the B2C Assets and the number of the player accounts being transferred, in violation of NRS 598.0915(5) and (15).

313.    As a result, EBET has been damaged in an amount exceeding the jurisdictional limit and to be proven at trial.

314.    At all times, the Aspire Defendants' conduct was willful, malicious and fraudulent such that punitive damages are appropriate.

315.    EBET has been forced to retain counsel as a result of the Aspire Defendants' wrongful conduct, and is entitled to an award of its reasonable fees and costs, pursuant to NRS 41.600(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, expressly reserving the right to amend this Complaint as necessary, prays for relief as follows:

1.    For general damages in excess $75,000.00, against Defendants;

2. For rescission damages in an amount of no less than 65 Million Euro or the equivalent in U.S. currency;

3. For an order rescinding the SPA;

4. For an order rescinding the Note;

5. For an order rescinding the Release;

6. For punitive damages;

7. For an award of pre-judgment and post judgment interest;

8. For reasonable attorneys' fees and costs of suit incurred herein;

9. For an order declaring each Aspire defendant to be the alter ego of the other;

10. For an order declaring each Neogames defendant to be the alter ego of the other;

11. For an order declaring the Neogames Defendants to be the alter ego of the Aspire Defendants; and

12. For such other and further relief as this Court deems just, equitable, and proper.

Dated: February 23, 2024          Respectfully submitted,

By __/s/   *Therese M. Shanks*_____

John D. Tennert, III, NV Bar No. 11728
Therese M. Shanks, NV Bar No. 12890
MaryJo E. Smart, NV Bar No. 16139
**FENNEMORE CRAIG, P.C.**
7800 Rancharrah Parkway
Reno, Nevada  89511
Telephone: (775) 788-2200
Facsimile: (775) 788-2279
jtennert@fennemorelaw.com
tshanks@fennemorelaw.com
msmart@fennemorelaw.com

Farhad Novian
(admitted *pro hac vice*)
Andrew B. Goodman
(admitted *pro hac vice*)
Alexander P. Davis
(admitted *pro hac vice*)
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, California 90067
farhad@novianlaw.com
agoodman@novianlaw.com
davis@novianlaw.com

Chad S. Hummel, Esq.

(admitted *pro hac vice*)
**Sidley Austin LLP**
1999 Avenue of the Stars, 17th Floor
Los Angeles, California 90067
chummel@sidley.com

Anna Tutundjian (*pro hac vice pending*)
atutundjian@sidley.com
**SIDLEY AUSTIN LLP**
555 West Fifth Street
Los Angeles, CA 90013
atutundjian@sidley.com

*Attorneys for Plaintiff EBET, Inc.*

1

## CERTIFICATE OF SERVICE

2      I certify that I am an employee of NOVIAN & NOVIAN, LLP, and that on this date,

3   pursuant to FRCP 5(b), I am serving a true and correct copy of the above-entitled document on the

4   parties set forth below by:

5

6   _____     Hand delivery at parties' 16.1 conference

7   _____     Placing an original or true copy thereof in a sealed envelope placed for
                 collection and mailing in the United States Mail, at Reno, Nevada, postage
8                prepaid, following ordinary business practices

9   _____     Certified Mail, Return Receipt Requested

10   _____     Via email

11   _____    Placing an original or true copy thereof in a sealed envelope and causing the
                 same to be personally Hand Delivered
12

13   _____    Federal Express (or other overnight delivery)

14   __X__       E-service effected by CM/ECF

15

16   addressed as follows:

17   Todd L. Bice, Esq.                    Robert S. Loigman, Esq.
     Emily A. Buchwald, Esq.               Ryan A. Rakower, Esq.
18   Daniel R. Brady, Esq.                 Caitlin E. Jokubaitis, Esq.
     Pisanelli Bice, PLLC                  Quinn Emanuel Urquhart & Sullivan, LLP
19   400 S. 7th Street, Suite 300          51 Madison Avenue, 22nd Floor
     Las Vegas, NV 89101                   New York, NY 10010
20   tlb@pisanellibice.com                 robertloigman@quinnemanuel.com
     EAB@pisanellibice.com                 ryanrakower@quinnemanuel.com
21   DRB@pisanellibice.com                 caitlinjokubaitis@quinnemanuel.com
     *Attorneys for Defendants*            *Attorneys for Defendants*

22

23

24   DATED this 23rd day of February, 2024.

25

26                                         /s/ Amanda McGill
                                           Employee of NOVIAN & NOVIAN, LLP
27

28

1

## CERTIFICATE OF SERVICE

2    I certify that I am an employee of FENNEMORE CRAIG, P.C., and that on this date,

3 pursuant to FRCP 5(b), I am serving a true and correct copy of the above-entitled document on the

4 parties set forth below by:

5

6    _____    Hand delivery at parties' 16.1 conference

7    _____    Placing an original or true copy thereof in a sealed envelope placed for
              collection and mailing in the United States Mail, at Reno, Nevada, postage
8              prepaid, following ordinary business practices

9    _____    Certified Mail, Return Receipt Requested

10   _____    Via email

11   _____    Placing an original or true copy thereof in a sealed envelope and causing the
              same to be personally Hand Delivered
12

13   _____    Federal Express (or other overnight delivery)

14   __X___    E-service effected by CM/ECF

15

16 addressed as follows:

17   Todd L. Bice, Esq.                    Robert S. Loigman, Esq.
     Emily A. Buchwald, Esq.               Ryan A. Rakower, Esq.
18   Daniel R. Brady, Esq.                 Caitlin E. Jokubaitis, Esq.
     Pisanelli Bice, PLLC                  Quinn Emanuel Urquhart & Sullivan, LLP
19   400 S. 7th Street, Suite 300          51 Madison Avenue, 22nd Floor
     Las Vegas, NV 89101                   New York, NY 10010
20   tlb@pisanellibice.com                 robertloigman@quinnemanuel.com
     EAB@pisanellibice.com                 ryanrakower@quinnemanuel.com
21   DRB@pisanellibice.com                 caitlinjokubaitis@quinnemanuel.com
     *Attorneys for Defendants*            *Attorneys for Defendants*
22

23 DATED this 13th day of May 2024.

24

25                                         */s/ Debbie Sorensen*
                                           Employee of FENNEMORE CRAIG, P.C.
26

27

28