UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| EBET, INC.,<br><br>                    Plaintiff,<br>          vs.<br><br>ASPIRE GLOBAL INTERNATIONAL LIMITED, *et al.*,<br><br>                    Defendants. | Case No.: 2:23-cv-01830-GMN-DJA<br><br>**ORDER GRANTING MOTION TO DISMISS** |

Pending before the Court is a Motion to Dismiss, (ECF Nos. 68, 69),[1] filed by Defendants Aspire Global International Limited, AG Communications Limited, Aspire Global 7 Limited, Aspire Global PLC, (collectively, "Aspire" or the "Aspire Defendants"), and Neogames S.A., NeoGames Connect S.a.r.l., and NeoGames Connect Limited, (collectively "NeoGames" or the "NeoGames Defendants"). Plaintiff EBET, Inc. filed a Response, (ECF No. 79), to which Defendants filed a Reply, (ECF No. 85).

Because the Court finds that it does not have personal jurisdiction over Defendants, the Court **GRANTS** the Motion to Dismiss.

**I.      BACKGROUND**

This case arises out of a 2021 transaction during which Plaintiff EBET, an online gambling company, purchased business-to-consumer ("B2C") assets from the Aspire Defendants, which are companies that provide casino software. (*See generally* First Am. Compl. ("FAC"), ECF No. 61). Plaintiff alleges that the Aspire Defendants conspired with their now-parent corporations, the NeoGames Defendants, to perpetrate fraud through their representations about the B2C assets and induce Plaintiff into purchasing them. (*Id.* ¶ 2).

---

[1] ECF No. 69 is the sealed version of Defendants' redacted Motion to Dismiss, ECF No. 68.

According to Plaintiff, Aspire's motive for this fraud was to make 65 million euros in the sale of the B2C assets and to be acquired at a higher price by a third-party. (*Id.* ¶ 4). Plaintiff asserts that Aspire knew the B2C assets were compromised because it had artificially lowered its operating costs, and Aspire wanted to remove the compromised B2C assets from its asset base to obtain a maximum purchase price during an acquisition. (*Id.* ¶¶ 5–6).

In October of 2021, Plaintiff and Aspire entered into a Share Purchase Agreement ("SPA") to finalize the sale of the B2C assets. (*Id.* ¶¶ 116–23). Aspire transferred the assets to a special purpose entity, Karamba Limited, and Plaintiff purchased those shares for 50 million euros in cash, 10 million euros borrowed via a promissory note, and 5 million euros in Plaintiff's common stock. (*Id.* ¶ 118). The SPA incorporated several ancillary agreements including the Operator Services Agreements ("OSA"), Transitional Services Agreement ("TSA"), Asset Purchase Agreement, and Promissory Note. (*Id.* ¶ 117); (*see generally* SPA, Ex. A to First Mot. Dismiss, ECF No. 22-2).

After the sale, the Aspire Defendants continued to misrepresent key information regarding the B2C assets, and NeoGames announced its acquisition of Aspire PLC. (FAC ¶ 10, 139). When Plaintiff discovered the fraud, the Aspire Defendants induced it to enter into a Mutual Release and Settlement Agreement. (*Id.* ¶¶ 175–86). Plaintiff further learned that the Aspire Defendants did not transfer the number of represented player accounts, and the B2C Assets continued to underperform and experience issues. (*Id.* ¶¶ 187–216).

Plaintiff brings nine claims against the Aspire Defendants for (1) fraud in the inducement under the SPA and the Note, (2) recission of the SPA, (3) recission of the Note, (4) recission of the Release, (5) breach of contract, (6) breach of the implied covenant of good faith and fair dealing, (7) negligent misrepresentation, (8) alter ego, and (9) a violation of Nevada's Deceptive Trade Practices Act. (*Id.* ¶¶ 217–315). Plaintiff also brings a claim against Defendant NeoGames for alter ego and brings a claim for conspiracy against all Defendants.

(*Id.*). Defendants move to compel arbitration of all claims in Plaintiff's FAC, dismiss the FAC for lack of personal jurisdiction, and in the alternative, dismiss certain counts in the FAC for failure to state a claim. (*See generally* Mot. Dismiss, ECF Nos. 68, 69).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(2) permits a defendant, by way of motion, to assert the defense that a court lacks personal jurisdiction over a defendant. Fed. R. Civ. P. 12(b)(2). The party asserting the existence of jurisdiction bears the burden of establishing it. *See Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003). When a 12(b)(2) motion is based on written materials, rather than an evidentiary hearing, a "plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995). "This prima facie standard 'is not toothless,' however; [plaintiff] 'cannot simply rest on the bare allegations of its complaint.'" *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020) (quoting *In re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019)).

When no federal statute applies to the determination of personal jurisdiction, the law of the state in which the district court sits applies. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Because Nevada's long-arm statute reaches the outer limits of federal constitutional due process, courts in Nevada need only assess constitutional principles of due process when determining personal jurisdiction. *See* NRS 14.065; *Galatz v. Eighth Jud. Dist. Ct.*, 683 P.2d 26, 28 (Nev. 1984).

Due process requires that a non-resident defendant have minimum contacts with the forum state such that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts may give rise to either general jurisdiction or specific jurisdiction. *LSI Indus., Inc. v. Hubbell Lighting, Inc.*, 232 F.3d

1369, 1375 (Fed. Cir. 2000). General jurisdiction exists where a defendant maintains "continuous and systematic" ties with the forum state, even if those ties are unrelated to the cause of action. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984)). Specific jurisdiction exists where claims "arise[ ] out of" or "relate[ ] to" the contacts with the forum, even if those contacts are "isolated and sporadic." *Id.*

### III.     DISCUSSION

Defendants move to compel arbitration, as well as to dismiss Plaintiff's claims for lack of personal jurisdiction and for failure to state a claim. (*See generally* Mot. Dismiss). Because "[t]he district court must have personal jurisdiction over each individual third-party entity before compelling them to arbitrate," the Court first considers whether personal jurisdiction exists over Defendants. *See In re Boon Glob. Ltd.*, 923 F.3d at 650 (citing *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007)) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over . . . the parties (personal jurisdiction).").

Plaintiff alleges that the Court has specific jurisdiction over the Defendants. (FAC ¶¶ 45–75). It asserts, among other things, that NeoGames and Aspire do business in Nevada, have a Nevada address, and market its products and services to Nevada companies and residents. (*Id.* ¶¶ 45–65). Plaintiff further alleges that the Defendant Aspire Global PLC consented to personal jurisdiction in Nevada through a forum-selection clause in the Promissory Note and requests that the Court assert personal jurisdiction over the other Defendants because they function as alter egos to Aspire Global PLC. (*Id.* ¶¶ 65–75); (Resp. 24:8–25:23).

Defendants argue that there is no basis on which the Court may exercise personal jurisdiction because the Note's forum-selection clause provided that only the "borrower" – Plaintiff – submitted to jurisdiction in Nevada. (Mot. Dismiss 20:14–21). Instead, Defendants

rely on language in the SPA providing for dispute resolution in Malta. (*Id.*). They further assert that neither NeoGames nor Aspire purposefully availed themselves of the Nevada forum or purposefully directed their activities towards Nevada. (*Id.* 17:14–19:26).

### A. Forum-Selection Clause

The Court begins with Plaintiff's forum-selection clause argument. Courts apply federal law when interpreting a forum-selection clause. *Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1205 (9th Cir. 2011). A forum-selection clause "may give rise to waiver of objections to personal jurisdiction," "provided that the defendant agrees to be so bound." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007) (citing *Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 632 (9th Cir. 1982) (holding that the scope of a forum selection clause is a matter of contract). "The plain language of the contract should be considered first, with the understanding that the common or normal meaning of language will be given to the words . . . unless circumstances show that in a particular case a special meaning should be attached to it." *Simonoff*, 643 F.3d at 1205 (internal citations and quotation marks omitted).

Paragraph 6.4 of the Note contains a choice of law provision stating that the Note shall be enforced and governed by Nevada law, (FAC ¶ 67), which is a factor that the Court evaluates below in Section B. Relevant to Plaintiff's current argument, the Note also includes a forum-selection clause and asserts that the borrower "HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL AND STATE COURTS LOCATED IN CLARK COUNTY, NEVADA WITH RESPECT TO ANY DISPUTE ARISING UNDER THIS NOTE, THE AGREEMENTS ENTERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY." (*Id.*). The parties also agreed that they would both waive the defense of an inconvenient forum. (*Id.*).

Because this forum-selection clause requires only one party, the borrower, to submit to the jurisdiction of Nevada courts, it is considered "non-mutual." As another district court in this circuit has explained, "courts have held that simply because a forum-selection clause is non-mutual does not render it invalid." *High-Bassalik v. Al Jazeera Am.*, No. 2:15-cv-04427-CAS(FFMx), 2015 WL 9695227, at *7 (C.D. Cal. Nov. 2, 2015) (citing *Great American Ins. Co. of N.Y. v. Nippon Yusen Kaisha*, 2013 WL 3850675, at *5 (N.D. Cal. May 10, 2013) ("[F]orum selection clauses do not need to provide reciprocal and equal benefits to contracting parties to be enforceable."); *see also Medoil Corp. v. Citicorp*, 729 F.Supp. 1456, 1459–60 (S.D.N.Y. Feb 7, 1990) ("the nonmutuality of the forum-selection clause does not render it invalid.").

Plaintiff acknowledges that the Note requires only the borrower to submit to the jurisdiction of Nevada courts. (Resp. 18:13–20). However, it argues that non-mutuality wasn't the intent of the parties, as evidenced by the fact that both parties waived the defense of an inconvenient forum and agreed the Note would be governed under Nevada law. (*Id.*).

As an initial matter, a *forum non conveniens* argument relates to venue, not to whether the Court has personal jurisdiction over the Defendants. "*Forum non conveniens* is a common law doctrine that allows a court having jurisdiction over the subject matter and the parties to decline to exercise its jurisdiction where litigation in the forum would be seriously inconvenient for one of the parties, and a more convenient forum is available elsewhere." Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (2014 ed.) § 4:835; *see also Sinochem Int'l Co.*, 549 U.S. at 430. "[W]hile *forum non conveniens* and personal jurisdiction analyses overlap, they are by no means identical." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1116 (9th Cir. 2002). The doctrine of *forum non conveniens* is a drastic exercise of the court's 'inherent power' because, unlike a mere transfer of venue, it results in the dismissal of a plaintiff's case." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011).

Thus, the Court cannot rely on the parties' waiver of this argument as evidence of Aspire's consent to personal jurisdiction in Nevada.

Plaintiff does not meet its burden of providing evidence that Aspire intended to consent to personal jurisdiction, nor has it cited to any cases in which a court has determined that a defendant consented to personal jurisdiction based on a non-mutual forum-selection clause. And while the inclusion of a choice-of-law provision in the Promissory Note is not enough to confer jurisdiction on its own, it is relevant to the Court's purposeful availment argument as described below. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985)).  Applying the plain language of the contract, only the borrower, Plaintiff, consented to jurisdiction in Nevada.  The Court therefore declines to exercise personal jurisdiction over Aspire based on the Note's forum-selection clause and will move on to Plaintiff's additional specific jurisdiction arguments.

**B. Specific Jurisdiction**

Specific jurisdiction refers to "jurisdiction based on the relationship between the defendant's forum contacts and plaintiff's claims." *Menken v. Emm*, 503 F.3d 1050, 1057 (9th Cir. 2007).  Specific jurisdiction must arise out of "contacts that the 'defendant himself' creates with the forum State" and cannot be established from the conduct of a plaintiff or third parties within the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King Corp.*, 471 U.S. at 475).

Courts employ a three-prong test to analyze whether the assertion of specific personal jurisdiction in a given forum is proper:

> (1) The non-resident defendant must [a] purposefully direct his activities or consummate some transaction with the forum or resident thereof; or [b] perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.

"The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* If the plaintiff satisfies the first two prongs, the burden will shift to the defendant to show that exercising jurisdiction would be unreasonable. *Id.* "If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.*

The Ninth Circuit generally applies the "purposeful availment" standard to contract claims and the "purposeful direction" standard to tort claims. *Id.* In cases such as this one, however, when the plaintiff brings both tort and contract claims and all claims are premised on a parties' contractual relationship, courts apply a purposeful availment analysis. For example, in *Sher v. Johnson*, the Ninth Circuit applied a purposeful availment analysis to a complaint alleging both contract and tort claims in a legal malpractice suit. 911 F.2d 1357, 1362 (9th Cir. 1990). As part of the purposeful availment analysis, the court found that, "[a]lthough some of [plaintiff's] claims sound in tort, all arise out of [plaintiff's] contractual relationship with the defendants." *Id.*; *see also Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008) (applying a purposeful availment analysis to state law causes of action including breach of contract, misrepresentation, fraud, and violation of consumer protection laws because all claims were premised on the existence of a contract); *see also Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 758 (9th Cir. 1990) (applying purposeful availment test to claims for misrepresentation, recission, and breach of warranty). In this case, because Plaintiff's tort claims arise out of its contractual relationship with Aspire, the Court will apply the purposeful availment test.

1. **Defendants' Contacts with Nevada**

In assessing whether personal jurisdiction exists, a court may consider evidence presented in affidavits or order discovery on jurisdictional issues. *Data Disc, Inc. v. Sys. Tech.*

*Assoc., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). "Although uncontroverted allegations in the complaint must be taken as true and conflicts between parties over statements contained in affidavits must be resolved in [the plaintiff's] favor, disputed allegations in the complaint that are not supported with evidence or affidavits cannot establish jurisdiction." *AMA Multimedia*, 970 F.3d at 1207 (cleaned up).

First, the parties agree that all Defendants are incorporated in foreign jurisdictions. (FAC ¶¶ 18–20); (Mot. Dismiss 16:17–18). Defendants provide the Declaration of Tsachi Maimon, CEO of Aspire Global Limited between 2013 and 2022 and former President and Head of iGaming of Neo Group Ltd., sued as NeoGames S.A. (Maimon Decl. ¶ 1, Ex. 2 to Mot. Dismiss, ECF No. 69-2). Maimon asserts that the Aspire Defendants have their principal place of business in Malta, and the NeoGames Defendants have their principal place of business in Israel. (*Id.* ¶¶ 6, 28).

Maimon further states that Defendants do not have offices in Nevada, own or rent property there, or have a Nevada mailing address or phone number. (*Id.* ¶¶ 15, 29). And while NeoGames S.A. is registered to do business in Nevada, Aspire is not. (*Id.* ¶¶ 13, 35); (FAC ¶ 45). Plaintiff disputes this and alleges that Aspire does have a Nevada office in Las Vegas, based on a report from Aspire Global attached to their Request for Judicial Notice, (ECF No. 38). (FAC ¶ 57). But the address listed, as Defendants point out, is for Aspire Global US Inc., a subsidiary of Aspire Global that is not a party to this case. (*See* Aspire Global PLC's Annual Report at 61, Ex. A to Request for Jud. Notice, ECF No. 38-1).

The FAC also alleges that a NeoGames and Aspire Executive, Quincy Raven, lives in Las Vegas, Nevada. (FAC ¶¶ 49, 58). But Maimon's Declaration states that he is not an employee of any Defendant, but rather an independent contractor for Aspire Global who was not involved in the EBET sale. (Maimon Decl. ¶¶ 14–15, Ex. 2 to Mot. Dismiss). Regardless,

none of the Defendants have done business at Raven's address or advertised it to be their U.S. office. (*Id.*).

Next, Maimon asserts that Defendants do not provide B2C services to Nevada residents, nor do they market them. (*Id.* ¶¶ 13, 16). Aspire currently provides business-to-business ("B2B") products to clients outside of the United States, and prior to the transaction with Plaintiff, Aspire engaged in B2C transactions outside of the United States. (*Id.* ¶ 12). Thus, Defendants' jurisdictional contacts are primarily through NeoGames. NeoGames S.A. is registered to do business in Nevada, is licensed and regulated by the Nevada Gaming Commission and Nevada Gaming Control Board, and has a commercial registered agent in Nevada. (*Id.* ¶ 35). NeoGames and Aspire also attended the Global Gaming Exposition in Las Vegas in 2022 and 2023 relating to B2B gaming services. (FAC ¶¶ 47, 53, 62); (Maimon Decl. ¶ 23, Ex. 2 to Mot. Dismiss).

Relating to the transaction in this case, Maimon signed a term sheet and letter of intent with Plaintiff in May 2021 from his home in Spain, and Aspire did not conduct in-person meetings in the United States in connection with these documents. (Maimon Decl. ¶ 18, Ex. 2 to Mot. Dismiss). Between May and November 2021, he and other Aspire colleagues met with representatives from EBET to negotiate the terms of the transaction, but several of the meetings were held in Malta and none of them took place in Nevada or the United States. (*Id.* ¶ 19). They also conducted negotiations remotely over Zoom, Google Meet, and WhatsApp. (*Id.*). He signed the SPA and related documents, as well as the Release, remotely from his home in Spain on Aspire's behalf. (*Id.* ¶¶ 20–22). Plaintiff provided the Affidavit of Aaron Speach, the CEO of EBET, Inc., but Speach does not dispute the assertions made by Maimon. (*See* Speach Aff., Ex. 3 to Resp., ECF No. 70-3). Speach participated in negotiations for the B2C assets but does not clarify where the negotiations or contract signings took place. (*Id.*). With these facts in mind, the Court turns to the purposeful availment analysis.

### 2. Purposeful Availment

For a defendant to be subject to jurisdiction based on "purposeful availment," the defendant must have "deliberately reached out beyond [its] home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 503 (9th Cir. 2023). A defendant has purposely availed himself of the benefits of a forum if he has deliberately "engaged in significant activities within a State or has created 'continuing obligations' between himself and residents of the forum." *Burger King Corp.*, 471 U.S. at 475–76 (citations omitted). A contract alone does not automatically establish minimum contacts in the plaintiff's home forum. *Id.* at 478; *see also Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001). Rather, courts look to "a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing." *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1163 (9th Cir. 2023).

"With respect to prior negotiations, courts do not focus narrowly on the negotiation of specific contract terms; rather, they consider which party initiated the negotiations and whether the defendant reached out to the plaintiff in the forum (a factor that may support a finding of contractual purposeful availment)." *Senne v. Kansas City Royals Baseball Corp.*, 105 F. Supp. 3d 981, 1023 (N.D. Cal. 2015) (citing *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (explaining that the question of purposeful availment depends, in part, on which party initiated contact). Here, Plaintiff alleges that it was seeking acquisition targets with significant player databases in the gaming business and that it then began discussions with Aspire PLC regarding a potential acquisition. (FAC ¶ 86). This initiation by Plaintiff weighs against a finding of purposeful availment. Plaintiff also fails to provide an affidavit or declaration disputing Maimon's declaration that prior to this transaction, Aspire's B2C transactions occurred outside of the United States. (*See* Maimon Decl. ¶ 12, Ex. 2 to Mot. Dismiss). In fact,

Plaintiff asserts that at the time it entered into the SPA, the Aspire Defendants were operating the B2C Assets in Germany. (FAC ¶ 120).

Further, the FAC asserts that negotiations occurred orally, in writing, and through documents provided in a "virtual data room," but does not specify whether any of these meetings occurred in-person or in Nevada. (*See* FAC ¶¶ 100, 103, 105, 109). Maimon asserts that Aspire did not conduct in-person meetings in the United States, which Plaintiff does not dispute. (*See* Maimon Decl. ¶ 18, Ex. 2 to Mot. Dismiss). He states that meetings were held in Malta or occurred remotely over Zoom, Google Meet, and WhatsApp. (*Id.* ¶ 19). The remote telephone calls are "legally insufficient to enable the court to exercise personal jurisdiction over the non-resident defendant." *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985). Thus, nothing in the contract negotiations demonstrates Aspire's intention to avail itself of Nevada's laws. *See Sher*, 911 F.2d at 1363 (finding no purposeful availment in the course of negotiations when defendant "is solicited in its home state and takes no affirmative action to promote business within the forum state").

Moving to the contract terms, the relevant agreements entered into are the SPA, two OSAs, the Transitional Services Agreement, and the Promissory Note. (*See* FAC ¶ 71). The SPA is the primary governing document of the transaction at issue in this case and dictates the purchase price of 65 million euros. (*Id.* ¶¶ 117–18). The SPA requires all claims "arising out of or in connection with" the SPA be "decided exclusively by arbitration in Malta," where Aspire is located. (SPA at 25, Ex. A to First Mot. Dismiss). The two OSAs and the Transitional Services Agreement are also governed by Maltese law and are subject to the exclusive jurisdiction of the Maltese Courts. (Regulated Markets OSA at 22, Ex. 1 to Stip., ECF No. 24-1); (Unregulated Markets OSA at 22, Ex. 2 to Stip., ECF No. 24-2); (Transitional Services Agreement at 7, Ex. 3 to Stip., ECF No. 24-3).

Additionally, Plaintiff executed a Promissory Note with Aspire Global Limited, under which it borrowed ten million euros to finance a portion of the purchase price for the B2C assets. (Promissory Note, Ex. B to Resp., ECF No. 79-2). The header of the Promissory Note lists "Las Vegas, Nevada," and it contains a choice of law clause stating that "THIS NOTE SHALL BE ENFORCED, GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE." (*Id.* at 6). While this clause is likely the strongest evidence that Aspire purposefully availed itself of Nevada's laws, a choice-of-law provision, "standing alone would be insufficient to confer jurisdiction." *Burger King*, 471 U.S. at 482. The Supreme Court in *Burger King* acknowledged that a choice-of-law provision is relevant to a jurisdictional analysis but based its finding of personal jurisdiction on the finding that the provision, "when combined with the 20-year interdependent relationship" of the parties, "reinforced" the defendant's "deliberate affiliation with the forum [s]tate and the reasonable foreseeability of possible litigation there." *Id.* This case does not present a similar factual scenario or long relationship between the parties. Further, when the choice-of-law provision in the Promissory Note is evaluated alongside the SPA, which contemplated the existence of the Promissory Note and is governed by Maltese law, plus the other affiliated contracts governed by Maltese law, this factor is neutral at best.

The contemplated future consequences of the B2C transaction do not change the Court's analysis. Although Plaintiff alleges that the Aspire Defendants requested to provide certain services in connection with the B2C assets for three years, Plaintiff does not state whether those services occurred in Nevada or were related to Nevada in any way. (*See* FAC ¶ 93). In fact, Plaintiff states that it received permission from Aspire to operate the B2C assets under the Aspire Defendants' gaming licenses in other territories. (*Id.* ¶ 94). And the purpose of the two OSAs was to ensure the iGaming platform would operate with appropriate licenses in Great

Britain, Denmark, and Malta—not Nevada. (*Id.* ¶ 135). Without additional facts suggesting that the contracts' contemplated consequences included Aspire's goal to benefit from Nevada's laws, the obligations currently described in the FAC do not establish purposeful availment in the state. *See Boschetto*, 539 F.3d at 1019 (holding that the district court lacked personal jurisdiction over an out-of-state defendant in dispute over a "one-time contract for the sale of a good that involved the forum state only because that is where the purchaser happened to reside").

The Court is also missing jurisdictional facts relating to the Aspire Defendants' actual course of dealing with Plaintiff. Plaintiff alleges that the parties executed First and Second Amendments to the TSA requiring Aspire to assist Plaintiff with the creation of a "sustainable plan for a profitable business." (FAC ¶ 184). And the Aspire Defendants represented to Plaintiff during telephone calls that the B2C Assets could achieve a higher performance. (*Id.* ¶ 183). But Plaintiff fails to allege that the Aspire Defendants performed any of this work in Nevada or otherwise provided contract assistance in Nevada. The Ninth Circuit has explained that "the fact that a contract envisions one party discharging his obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the contract." *Picot v. Weston*, 780 F.3d 1206, 1213 (9th Cir. 2015). "And remote actions taken to service a contract in the forum state seldom lead to purposeful availment by themselves." *Davis*, 71 F.4th at 1165.

Plaintiff instead highlights the Defendants' attendance at the Global Gaming Exposition in Las Vegas, Nevada, in which it allegedly markets its products to Nevada residents. (FAC ¶ 53). However, Plaintiff's claims do not arise out of or relate to these trips such that they would be relevant to a finding of personal jurisdiction. Maimon's Declaration stated that NeoGames and Aspire attended two trade shows in Nevada, in 2022 and 2023, and that this related only to its B2B business. (Maimon Decl. ¶ 23, Ex. 2 to Mot. Dismiss). These two trips are insufficient

for a finding of purposeful availment because "[w]hile physical entry into the State is certainly a relevant contact, a defendant's transitory presence will support jurisdiction only if it was meaningful enough to create a substantial connection with the forum State." *Picot*, 780 F.3d at 1213.

Finally, assuming without deciding that the NeoGames Defendants are alter egos of the Aspire Defendants, the fact that NeoGames S.A. is registered to do business in Nevada and provides B2B services there does not lead the Court to find personal jurisdiction over the Defendants. *See Freeman v. Second Jud. Dist. Ct. ex rel. Cnty. of Washoe*, 1 P.3d 963, 968 (Nev. 2000); *King v. Am. Fam. Mut. Ins. Co.*, 632 F.3d 570, 578 (9th Cir. 2011). Even if it were, Defendants' B2B business in Nevada is unrelated to Plaintiff's contract claims relating to its purchase of Aspire's B2C assets. The second prong of the personal jurisdiction test is met if, but for the contacts between the defendant and the forum state, the cause of action would not have arisen. *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 271 (9th Cir. 1995). This requires "a direct nexus . . . between [a defendant's] contacts [with the forum state] and the cause of action." *Yamashita*, 62 F.4th at 504 (quoting *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013)). The Court cannot say that Plaintiff's claims would not have occurred but for the Defendants' B2B business sales in Nevada. Therefore, because Plaintiff's allegations fail to establish that Defendants had sufficient minimum contacts with Nevada and purposefully availed themselves of Nevada's laws, the Court declines jurisdiction over the Defendants. Because it is unclear whether amendment would be futile, however, the Court grants Plaintiff leave to amend and file a Second Amended Complaint if it can assert additional jurisdictional facts.

V. **CONCLUSION**

**IT IS HEREBY ORDERED** that the Motion to Dismiss, (ECF Nos. 68, 69), is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff may have 21 days from the date of this Order to file an amended complaint including jurisdictional facts against Defendants.

**DATED** this 31 day of January, 2025.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT